

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA



RECEIVED
MAY 24 2017

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>     Plaintiff-Respondent, | § | |
| | § | **Case No.: 17 2381** |
| v. | § | Former No.: 12-418-5 |
| | § | |
| FRANK THOMPSON,<br>     Defendant-Petitioner. | § | |

### PETITIONER'S MOTION FOR VACATION OF CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

Defendant-Petitioner Frank Thompson, pro se, moves this Honorable Court to vacate his convictions or, in the alternative, his sentence, based upon violations of his Fifth Amendment right to due process of law and Sixth Amendment right to effective assistance of counsel.

The indictment in the instant case was obtained through outrageous government misconduct, in violation of the Fifth Amendment of the Constitution and the prohibition of the federal government. This unlawful exercise of power/outrageous government conduct violates the universal sense of justice and is a structural error requiring reversal.

Petitioner's appellate counsel was ineffective on appeal for failing to argue that the district court should not have admitted, under Fed.R.Evid. 404(b), evidence of his text messages and evidence of prior bad acts. Had counsel challenge on appeal the meritorious issue of trial court violating Fed.R.Evid. Rule 404(b), a reasonable probability exists that the Petitioner's conviction would have been vacated upon remand.

Appellate counsel also erred on appeal in failing to argue that the district court failed to rule on his motion for judgment of acquittal, pursuant to Rule 29 of Federal Rules of Criminal Procedure. Had counsel done so, a possibility exists that the Petitioner's Rule 29 motion would have been granted and his conviction vacated upon remand.

Finally, Petitioner submits that because of the nature of his claims, that he should be entitled to an evidentiary hearing on the issues to further prove his claim.

In sum, Petitioner requests that this Court vacate his conviction and sentence in light of these constitutional violations. In support thereof, Petitioner provides the following procedural history of his case:

1. On August 9, 2012, a federal Grand Jury sitting in the Eastern District of Pennsylvania named Petitioner and others in a multi-count Indictment. Specifically, the indictment charged Petitioner with 18 USC § 1951(a) - Conspiracy to commit robbery with interferes with insterstate commerce; 18 USC 1951(a) - Attempted robbery which interferes with insterstate commerce and 18 USC § 2 - Aiding and abetting; 21 USC § 846 - Conspiracy to possess with intent to distribute 5 kilograms or more of cocaine; 21 USC § 846 - attempted possession with intent to distribute 5 kilograms or more of coaine and 18 USC § 2 - aiding and abetting; 18 USC § 924(c)(1)(a) - carrying a firearm during and in relation to a crime of violence and to a drug trafficking crime and 18 USC § 2 - aiding and abetting; 18 USC § 922(g)(1) - convicted felon in possession of a firearm.

2. On May 13, 2013, Petitioner appeared before the Honorable Juan R. Sanchez for a trial by jury. On May 22, 2013, Petitioner was found guilty of counts One, and Five and not guilty of Count Six.  On November 14, 2014, Judge Sanchez sentenced Appellant to 252 months imprisonment, followed by 10 years supervised release.

3. Petitioner filed a timely notice of appeal. Among the issues raised in the Third Circuit Court of Appeals, the Third Corcuit affirmed the conviction and sentence.

In consideration of the foregoing as well as the argument of law contained in the memorandum of law filed this same day, Petitioner respectfully prays that this court issue an order reversing his conviction in light of the constitutional errors that occurred. In the alternative, Petitioner would ask that the court vacate his sentence and grant him a new sentencing hearing.

Respectfully submitted,

5/22/17

Frank Thompson
Reg.No.#68400-066
FCI McKean
P.O. Box 8000
Bradford, PA 16701

## CERTIFICATE OF SERVICE

I, hereby certify that true and accurate copies of the foregoing motion and the following verification were served this 22 day of MAY, 2017 by ordinary US Mail upon the Office of the United States Attorney, 615 Chestnut Street, Suite 1250, Philadelphia, PA 19106.

Frank Thompson

3

## VERIFICATION

Pursuant to 28 USC 1746, I, Frank Thompson, declare under penalty of perjury that the foregoing statements are true and correct.

Executed on this _22_ day of May, 2017.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>     Plaintiff-Respondent, | § | |
| | § | Case No.: |
| v. | § | Former No.: 12-418-5 |
| | § | |
| FRANK THOMPSON,<br>     Defendant-Petitioner. | § | |

### MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S § 2255 MOTION

Petitioner's Fifth Amendment right to due process of law and Sixth Amendment right to effective assistance of counsel were violated in this matter. The indictment in the instant case was obtained through outrageous government conduct, in violation of the Fifth Amendment of the Constitution.

Petitioner's appellate counsel was ineffective on appeal for failing to argue that the district court violated Federal Rules of Evidence Rule 404(b). Had counsel challenge the meritorious issue on appeal, a possibility exists that the Petitioner's conviction would have been vacated and granted a new trial.

Appellate counsel was also ineffective on appeal in failing to argue that the district court failed to rule on his motion for judgment of acquittal, pursuant to Rule 29 of Federal Rules of Criminal Procedure. Had counsel raised the issue, a possibility exists that the Third Circuit would have granted the Rule 29 motion. Finally, Petitioner contends that because of the nature of his claims in the present motion he should be granted an evidentiary hearing to further prove his claims.

## STATEMENT OF ISSUES UNDER CONSIDERATION

I.      Outrageous Government Conduct

II.     Petitioner's Appellate Counsel Deprived Him of Effective Assistance and Due Process of Law on Direct Appeal by Failing to Argue that the District Court Violated Fed.R.Evid. Rule 404(b).

III.    Petitioner's Appellate Counsel Deprived Him of Effective Assistance and Due Process of Law on Direct Appeal by Failing to Argue that the District Court Failed to Rule on his Rule 29 Motion.

IV.     Whether the Petitioner is Entitled to an Evidentiary Hearing on These Issues.

## LAW AND ARGUMENT

Petitioner's first substantive argument turns upon the Fifth Amendment of the Constitution. The second two arguments turn upon the Sixth Amendment guarantee that every criminal defendant is entitled to the assistance of counsel in presenting their defense. For these reason, Petitioner generally addresses that standard as a threshold matter.

The Fifth Amendment to the Constitution commands that "[n]o person shall...be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V.. The Due Process Clause stands as a bar to the Government invoking judicial process to obtain a conviction when its conduct is "outrageous." United States v. Russell, 411 U.S. 423, 431-32 (1973)

The U.S. Supreme Court has stated, "The right to counsel is a fundamental right of criminal defendants; it assures the fairness and thus, the legitimacy, of our adversary process." Kimmelman v. Morrison, 477 U.S. 365, 374 (1976). Furthermore, the High Court has recognized that "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 (1970); United States v. Day, 969 F2d 39, 42 (3d Cir. 1992). The right to effective assistance of counsel at any critical stage encompasses the right to have an advocate for one's cause. Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed 377 (1940) Counsel must "subject the prosecution's case to meaningful adversarial testing." United States v. Cronic, 466 U.S. 648, 659 (1984).

To succeed on a claim of ineffective assistance of counsel, a defendant must show that his "counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on a having produced a just result." Strickland v. Washington, 466 US 668, 686, 104 S.Ct. 2055, 2063 (1984). The Court in Strickland went on to hold that in order for a defendant to prevail on an ineffective assistance of counsel claim, he must satisfy a two-prong test. A defendant must demonstrate that the representation he received "fell below an objective standard of reasonableness" and he must establsih "a reasonable probability that but for counsel's unprofessional errors, the results of the proceedings would have been different." Id at 688, 694, See Sistrunk v. Vaughn, 96 F3d 666, 670 (3rd Cir. 1996). When evaluating counsel's performance, a court should not "focus[] solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 US 364, 369, 122 L.Ed.2d 180, 113 S.Ct. 838 (1993).

### PETITIONER'S INDICTMENT SHOULD BE DISMISSED
### DUE TO OUTRAGEOUS GOVERNMENT CONDUCT

The only way to effectively control the Government in this case and effectuate the due process that the Constitution demands is to dismiss this indictment which the ATF obtained against Defendant Frank Thompson through outrageous government conduct.

I.  **JURISDICTION:**

This Honorable Court, the United States District Court for the Eastern District of Pennsylvania, is the court of original jurisdiction and has both the authority and jurisdiction to hear and decide the issue presented. There is no time bar to claims attacking the validity of the indictment, a threshold issue amounting to structural error.

II.  **FACTUAL BACKGROUND:**

To catch individuals suspected of engaging in home-invasion robberies, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent, acting in an undercover capacity ("UA") masquerades as a "cocaine courier who wishes to steal the cocaine he expected to pick up from a location in the Philadelphia area. ("UA"), consistent with previous ATF reverse-sting operation, paints a picture of an all-too-easy stash-house robbery. He tells unwitting individuals a tale of bountiful harvests of at least ten kilograms of cocaine being guarded by two individuals. The only problem: it's all a lie.

ATF Agent ("UA") interaction with Defendants began around June of 2012. The Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE) implemented a nationwide stash-house sting operation wherein it would troll economically disadvantaged neighborhoods with fantastic tales of lightly guarded stash houses containing large quantities of cocaine. The legality and wisdom of this program have received national criticism. United States v. Dunlap, 14-50129. (9th Cir. December 4, 2014)

4

In this case, an undercover BATFE agent, ("UA") Agent Patrick Edwards approached Mr. Whitfield inquiring about whether another individual, Kwasi Payne, was available to do a home invasion. The home in question did not exist; the home was a law enforcement fabrication. Inside of the nonexistent home were nonexistent drugs guarded by a nonexistent old man and a nonexistent boy. The males had a nonexistent firearm  to guard ten kilograms of cocaine which, consistent everything else described by the agent, did not exist.

Mr. Whitfield was a petty criminal who jumped at the opportunity for such a large payday. After series of meetings with the undercover agent at a Chinese restaurant, Mr. Whitfield agreed to do the crime. The UA stated there was at least -ten kilos of cocaine worth approximately  $400,000.00. Mr. Murray did attend one of these meetings. Defendnat was never in attendance at these meetings; further, his name was never mentioned. These meetings were recorded by way of a concealed body camera which captured both audio and video. The quality of those videos was choppy and poor. After attending the meeting, Mr. Murray and Thompson met and Murray repeated the undercover agent's sales pitch. A skeptical Thompson accompanied Murray to the meeting.

(UA) (i.e. Agent Edwards) agreed with the men to meet at a hotel as a staging area wherein the men would make any final decisions. The hotel was located near the Philadelphia International Airport. At the hotel, more men showed up than had been discussed at the restaurant meetings. All the men who showed up at the hotel were arrested and eventually became all the codefendants in this case.

At the hotel meeting, the UA – Agent Edwards repeated his story to the assembled cast. This meeting was also recorded. This first and only recording of Thompson shows he was on the periphery of the group and that he made minimal and arguably unintelligible comments during the course of the meeting. Thompson was distinguished by his wearing a white T-Shirt and holding a water bottle. This was the first time the UA – Agent Edwards met Thompson.

It was agreed that the group would relocate to another site, a salvage yard, to make final preparations for the robbery. A caravan of four vehicles left the scene. Thompson and Murray where in the last vehicle. Murray was driving his vehicle; Thompson was in the front passenger seat. Murray had a pistol concealed in his waist. The first three vehicles turned into the salvage yard as agreed at the hotel. Murray drove past the salvage yard and drove into the neighboring gas station where he made a small purchase was made from the store.

The individuals in the salvage yard engaged in what was testified to as preparations for the pending event. A flash bang grenade signaled the start of a coordinated arrest of the men in the salvage yard involving BATFE tactical officers and local law enforcement. Thompson and Murray were surrounded and arrested without incident at the gas station.

In sum, the UA – Agent Edwards told a fairy tale of quick and easy riches that could be taken with minimal risk to men vulnerable to such persuasion because of their desperate financial straits and nonexistent opportunities to provide for their families. After a group meeting, some men went to the salvage yard to prepare for the robbery and were arrested. Thompson and Murray drove to a gas station where they were arrested after purchasing snacks.

On August 9, 2012, the Grand Jury indicted Defendant's for alleged violation of 18 USC 1951(a) (conspiracy to commit robbery which interferences with insterstate commerce); 18 USC 1951(a) (attempted robbery which interferes with interstate commerce and 18 USC 2 – aiding and abetting); 21 USC 846 (conspiracy to possess with intent to distribute 5 kilograms or more of cocaine); 18 USC 924(c)(1)(A) (carrying a firearm and in relation to a crime of violation and to a drug trafficking crime and 18 USC 2 – aiding and abetting) and 18 USC 922(g)(1) (conviction felon in possession of a firearm).

III.     LEGAL STANDARD:

The Fifth Amendment to the Constitution commands that "[n]o person shall...be deprived of life, liberty, or property without due process of law." U.S. Const amend. V. The Due Process Clause stands as a bar to the Government invoking judicial process to obtain a conviction when its conduct is "outrageous." United States v. Russell, 411 U.S. 423, 431-32 (1973)(Rehnquist, J.). The outrageous-government-conduct doctrine permits a court to dismiss an indictment when the Government engages in conduct "so grossly shocking and so outrageous as to violate the universal sense of justice." United States v. Smith, 924 F2d 889, 897 (9th Cir. 1991). Judicial scrutiny focuses solely on the government's actions – not the alleged actions of the criminal defendant. The outrageous-government-conduct doctrine thus differs in that respect from an entrapment defense. Id.

There is no brightline test for determining whether to apply this doctrine. United States v. Black, 733 F3d 294, 302 (9th Cir. 2013) In United States v. Bonanno, 852 F2d 434 (9th Cir. 1988), the Ninth Circuit previously developed a multifactor inquiry to determine whether to dismiss an indictment for outrageous government conduct.

But in the most recent case on point, the Ninth Circuit disavowed rigid application of the Bonanno inquiry and subsumed it within a new multifactor rubic. Black, 733 F3d 294, 304 n7 (9th Cir. 2013)(rejecting the Bonanno factors as a "test"). The Ninth Circuit expounded a new, totality-of-the-circumstances standard that a court must consider in assessing the outrageousness of the Government's conduct:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

Id at 303. The burden, at least in reversing cases like this one, is on the Government to establish that its conduct does not surpass due-process limitations. Id.


IV.     STANDARD OF REVIEW:

Defendant presents his position that outrageous-government-misconduct is a structural error requiring reversal. The Supreme Court opinion in United States v. Gonzalez-Lopez, 126 S.Ct. 1557, 2564 (2007) describes three circumstances in which an error is "structural". (1) If its consequences are necessarily difficult to assess, (2) If it necessarily renders the criminal proceeding unfair, or (3) If the harmless error inquiry is irrelevant to remedying the constitutional error. Any of these three is sufficient, not all three must be present to meet the criteria of structural error.

<u>ARGUMENT</u>

## I.   <u>OUTRAGEOUS GOVERNMENT CONDUCT</u>

Defendant contends that the indictment in the instant case should be dismissed due to outrageous government conduct, namely, the ATF's entire fake stash-house scheme, because of the Government's extensive involvement in dreaming up this fanciful scheme – including the arbitrary amount of drugs and illusory need for weapons and extra associates – which transcends the bounds of due process and renders the Government's actions outrageous.

In the instant case, all of the factors the Ninth Circuit expounded in Black weigh in favor of dismissing the indictment for outrageous government conduct.

1. Defendant's known criminal characteristics

In assessing the outrageousness of the Government's conduct, the Ninth Circuit has stated that a court should consider "whether a defendant had a criminal background or propensity the government knew about when it initiated its sting operation." Black, 733 F3d at 304 (emphasis added).

Here, there is no indication that the ATF, Edwards, or the CI had any knowledge of Defendant's alledge "criminal background or propensity" prior to Edwards inventing the stash-house scheme. In fact, Defendant did not even come into the picture until the Agent agreed with the men to meet at a hotel as a staging area, the same day before his arrest and long after the Government had begun laying out the stash-house ruse. Absent a crystal ball, it is therefore impossible for Thompson – or anyone else at the ATF – to have known the slightest details about Defendant in advance of the Hotel meeting.

9

2. Individual suspicion of the defendants

Defendant points out that there is no evidence that he was previously involved - or even suspect of being involved - in stash house robberies. Here, the ATF sought to "investigate individuals suspected of being involved in home invasion robberies." But not once did the ATF indicate that it suspected Defendant of being associated with home invasions. At best, the ATF operated off a hunch that Defendant and the others were up to no good. But something more is required before the Government can ensnare individuals in all-too-tempting, made-up robbery and take 20-plus years away from their lives.

3. Government's role in creating the crime of conviction

The United States Supreme Court has drawn a line betwee infiltrating an ongoing criminal enterprise on one hand and manufacturing crime on the other. The Court stated that the "function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." Sherman v. United States, 356 U.S. 369, 372 (1958). While the Government may not create crime, the Court has accepted that "infiltration is a recognized and permissible means of investigation." Russell, 411 U.S. at 432; see also Black, 733 F3d at 305 ("Also relevant is whether the government approached the defendant initially or the defendant approached a government agent, and whether the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing.").

But for the undercover agent's imagination in this case there would be no crime. The undercover agent invented his drug-courier persona, the stash house, the 10 kilograms of cocaine supposedly inside the stash house, the two individuals supposedly guarding the stash, the need to use weapons, and the idea of robbing the stash house. He even provided the putative safe house and getaway van. Defendant brought nothing to the table besides his sheer presence and/or the hope of being able to obtain some quick cash. In fact, he did not take any "role in planning the crime".... Rather, the most it appears he did was appear at the Hotel meeting and was a passenger in Murrays vehicle.

10

Despite the Supreme Court's admonition, the ATF manufactured this entire crime. It did not infiltrate an ongoing criminal enterprise, as there is no indication that Kwasi Payne, Whitfield, and Defendant had any previous criminal affiliation between them. In fact, before the CI informed his uncle – Agent Edwards that Whitfield was interested in "come ups," Defendants, specifically the Defendant, were not even on the ATF's radar. Total falsity concocted by the ATF was precisely one of the Ninth Circuit's concerns in Black. 733 F3d at 303 ("Although [the defendants' actions in participating in the plan] clearly corroborate the defendants' intent to carry out an armed robbery, defendants were responding to the government's script."). That fiction is likewise should be one of this Court's misgivings and weighs in favor of dismission the indictment.

4.  Government's encouragement of the defendants to the commit the crime

A court must also consider the extent to which the Government encouraged the defendant to commit the crime charged, "with mere encouragement being of lesser concern than pressure or coercion.

While there may be no indication that the undercover agent or the CI  threatened or otherwise coerced Defendants, specifically the Defendant, to enter into the conspiracy, one cannot turn a blind eye to the economic coercion inherent in a fake stash-house case like this. The Government essentially targets people who are poor and have distorted moral compasses. With the Government dangling over $400,000 in front of clearly improverished individuals, it is no surprise that they took the bait.

11

In a recent scholarly article, Professor Eda Katharine Tinto echoes the Court's concerns. She writes, "The inducements used to persuade suspects to commit, or simply to agree to commit, a serious and severely sentenced set of crimes elicits significant questions regarding the extent of the defendants' blameworthiness and the possibility that the mandatory sentence will be disproportional to any determination of culpability." Undercover Policing, Overstated Culpability, 34 Cardozo L. Rev. 1401, 1451 (2013). Professor Tinto's point is well taken. It is difficult to comprehend how a person like Defendant deserves a 20-plus-year sentence for allegedly being part of an entirely fake robbery scheme for a mere 20 minutes - especially when the extent of his involvement was merely being at the Hotel meeting for only 20 minutes, and that he was on the periphery of the group and that he made minimal and arguably unintelligible comments during the course of the meeting.

So while arm-twisting and extortionate threats would easily satisfy the government-coercion factor, so too should the Government hitting individuals like Defendant where they are most vulnerable: their depressed economis circumstances. Here, the court should consequently find, that this factor weighs in favor of an outoutrageous-conduct determination.

5.  Nature of the government's participation in the offense conduct

In assessing the Government's participation in the crime alleged, the Ninth Circuit considers the duration, nature, and necessity of the Government's actions. Black, 733 F3d at 308-09.

Here, on June 27, 2012, the ("UA") Agent Edwards explained to Whitfield that he was a drug courier who transported kilogram quantities of cocaine from Philadelphia to New York City. He stated that he picks up the cocaine from a "stash" house, where at least ten kilograms of cocaine was stored. The ("UA") Agent Edwards stated that the "stash" house was guarded by two individuals, whom carries firearms. He emphasized that he wanted an experienced crew to carry out the robbery of cocaine.

The undercover agent ("UA") Agent Edwards confirmed that he had rented a van to be used in the robbery. Agent Edwards, accompanied by Whitfield, led the caravan. These statements demonstrates that Defendants did not call the shots when it came to timing; instead, they simply followed the undercover agent's lead and met him when he asked. The Government's drawn-out, thirty-eight days involvement in this fictitious stash-house scheme thus only weighs in favor of dismissing the indictment. See Black, 733 F3d at 308 (observing that Government participation of longer duration is "of greater concern" than short-term involvement). In assessing whether the Government has engaged in outrageous conduct, the focus is solely on the its actions - not the defendants. United States v. Restrepo, 930 F2d 707, 712 (9th Cir. 2013) It is therefore erroneous to justify this fake stash-house scheme based on what Defendants did or did not do.

The nature of the ATF's conduct similarily tips the scale against the Government. In Black, the court noted that the undercover agent "provided no weapons, plans, manpower or direction about how to perform the robbery, even when the defendants sought his advice." Id. at 309. But here, the undercover agent - Agent Edwards provided a getaway van, putative safe house, and - most important of all - the entire scheme and its fictitious components.

Agent Edwards also goaded Defendant to acquire weapons. He repeated several times over the course of the $1\frac{1}{2}$ —month ruse that "individuals [guarding the none existent stash house] carried firearms." With Edwards continually sounding the war horn, it is not surprising that Defendants showed up to the final meeting with weapons.

The undercover agent's continued participation, assurances, and suggestions over the course of the thrity-eight day period made him "a partner in the criminal activity" rather than a mere "observer." See Black, 733 F3d at 308. His input was likewise "necessary" for Defendants to carry out their doomed plan, since but for Edwards's imagination, there would have been no fictitious stash-house robbery to begin with - let alone the need for guns and extra associates. See id at 309.

In these stash-house cases, the Government's "participation in the offense conduct" is what makes them particularly repugnant to the Constitution. Everything about the scheme - and therefore almost everything bearing upon a defendant's ultimate sentence - hinges solely on the Government's whim. Why were there not 5 kilograms in the stash house? Or 100? Or 1,000? Why were the guards allegedly armed - necessitating that Defendants bring weapons along with them? All of these factors came down to the ATF and the undercover agent alone. That sort of arbitrariness offends the Constitution's due process demands. See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 127 n.10 (1992)("[T]he Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government..." (citation omitted)(internal quotation marks omitted)); Black, 733 F3d at 317 (Noonan, J., dissenting)("[I]t is a violation of due process for sentences to be at the arbitrary discretion of the ATF.").

14

In the instant case, the Government seeked to prosecute Defendant for a fake crime it cut from whole cloth. To justify the serious sentence Defendant faced as a result of its imagination, the Government used its creation of crime, including the need to establish the undercover agent's credibility, as the validation for the amount of drugs. The amount of drugs then justifies the sentence. But since the Government created each necessity and justification, the sentence no longer bears a proportional relationship to the defendant's culpability-just the Government's imagination. Something more than mere bootstrapping is needed for the Government to take 20-plus years away from Defendant's life.

The Court thus should find that the Government's extensive, essential participation in the offense conduct in this case tips the scales of justice in Defendant's favor. Society does not win when the Government stoops to the same level as the defendants it seeks to prosecute - especially when the Government has acted soley to achieve a conviction for a made-up crime.

6. Nature of the crime being pursued and necessity for government's
   actions

Zero. That's the amount of drugs that the Government has taken off the streets as the result of this case and the hundreds of other fake stash-house cases around the country. That's the problem with creating crime: the Government is not making the country any safer or reducing the actual flow of drugs. But for the Government's action, the fake stash house would still be fake, the nonexistent drugs would still be nonexistent, and the fictional armed guards would still be fictional. See Black, 733 F3d at 302-03 (finding the Government's entire fiction to be troubling"). Instead, the Government comes close to imprisoning people solely because of their thoughts and economic circumstances rather than their criminal actions.

15

Reverse stings actually serve to benefit real stash-house operators. As the framed Law and Economics jurist Judge Richard Posner observed,

> The effect of a fictitious stash house sting, when the person stung is...a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses – security obtained at no cost to the operators of stash houses – reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business's demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would pay law enforcement to sting potential stash house robbers.

United States v. Kindle, 698 F3d 401, 416 (7th Cir. 2012)(Posner, J., concurring and dissenting), reh'g en banc granted, opinion vacated (Jan. 16, 2013), vert. denied, 133 S.Ct. 1743 (2013).

But these stash-house cases do cost someone money: federal taxpayers. These fake robberies cost federal taxpayers approximately $433,401 per defendant in incarceration costs alone – not to mention investigative, prosecutorial, defense, and judicial resources. That number only continue to skyrocket if a defendant is subject to a higher criminal history category and aggravating factors. Society must question whether the astronomical cost associated with prosecuting fake crime is worth it. In a recent Wall Street Journal article, United States District Judge Michael A. Ponsor remarked, "Today, we imprison more of our people than any other country in the world...Either our fellow Americans are far more dangerous than the citizens of any other country, or something is seriously out of whack in the criminal-justice system." Hon. Michael A. Ponsor, The Prisoner I Lose Sleep Over, The Wall Street Journal, Feb 12, 2014. When the nation imprisons people solely because the Government dreams up a too-good-to-turn-down robbery and then targets people it knows are eager to make an easy buck, Judge Ponsor's concerns are only further borne out.

16

The Court in no way decries all reverse-sting operations as a matter of law. Used properly, they can be a powerful tool for law enforcement to catch dangerous individuals plotting serious crime before they succeed and harm others. But when the goal of the reverse sting becomes landing convictions alone, the Government loses the justification for employing this crime-fighting tool. Whenever the line is drawn, this case falls on Defendant's side. Due process demands that much.

\* \* \* \* \* \*

The Court is mindful of the Supreme Court's admonition in Russell: the federal judiciary does not have "a 'chancellor's foot' veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." 411 U.S. at 435. The Executive Branch's enforcement obligation is certainly a difficult one, as people will always find new ways of evading law-enforcement detection and carrying out their criminal enterprises. This ever-shifting landscape demands that law-enforcement agencies employ creative tactics to ferret out crime and keep society safe.

But it is not the role of the Judicial Branch to merely rubberstamp whatever imaginative device the ATF and other agencies dream up. Rather, it is the duty of the courts "to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78 (Alexander Hamilton).

17

The time has come to remind the Executive Branch that the Constitution charges it with law enforcement - not crime creation. A reverse-sting operation like this one transcends the bounds of due process and makes the Government "the oppressor of its people." 733 F3d at 318 (Noonan, J., dissenting). In this case, the Constitution will not tolerate subjecting an individual to prosecution for an imaginary crime subject to a very real punishment - a punishment which rests entirely on ATF agents' whims. Therefore, since it is the Court's sworn duty to uphold the Constitution, Defendant asks that this Court grant his Motion to Dismiss the Indictment and reverse and vacate his convictions.


II.     **PETITIONER'S APPELLATE COUNSEL DEPRIVED HIM OF EFFECTIVE ASSISTANCE AND DUE PROCESS OF LAW ON DIRECT APPEAL BY FAILING TO ARGUE THAT THE DISTRICT COURT VIOLATED Fed.R.Evid. RULE 404(b).**

Petitioner contends that counsel was ineffective on appeal for failing to argue that the district court should not have admitted, under Fed.R.Evid. 404(b), evidence of his "Text Messages" that he sent to co-defendant Najee Murray and "prior bad acts" that he allegedly robbed dice games in the past. Had appellate counsel challenge on appeal the meritorious issues of the district court's violation of Federal Rule of Evidence 404(b), a reasonable probability exists that the Petitioner's conviction would have been vacated and a new trial would have been granted.

A defendant has a right to the assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 394 (1985) This right is violated when counsel's performance in ineffective. Alvord v. Wainwright, 725 F2d 1282 (11th Cir. 1984) To determine if counsel's performance was ineffective, a defendant must show that the performance of his attorney was deficient, and that this performance prejudiced the case. Strickland v. Washington, 466 US 668, 687 (1984). In addition, "In preparing and evaluating the case, and in advising the client as to the prospects for success, counsel must consistently

serve the clients interest to the best of his or her ability." McCoy v. Court of Appeals

of Wisconsin, Dist. 1, 486 US 429, 438 (1988). In doing so, counsel has the duty to

search for the strongest arguments possible, and "must be zealous and must resolve all

doubts and ambiguous legal questions in favor of his or her client." Id at 444. In

determining whether counsel's performance was ineffective, the performance is evaluated

for reasonableness under prevailing professional norms." Strickland, 466 US at 688. In

Cross v. United States, 893 F2d 1287 (11th Cir. 1990), the Eleventh Circuit noted that in

order to determine prejudice a court must first perform "a review of the merits of the

[omitted or poorly presented] claim." Id at 1290. If it is determined that the claims

that counsel failed to raise would have had a reasonable probability of success if raised

on appeal, then the court should find "appellate counsel's performance prejudicial because

it affected the outcome of the appeal." Id.


Rule 404(b) prohibits the admission of "[e]vidence of a crime, wrong, or other

act * * * to prove a person's character in order to show that on a particular occasion the

person acted in accordance with the character." Fed.R.Evid. 404(b)(1).


### (a)    Text Message(s)

In the instant case, Petitioner  contends that the district court should not

have admitted, under Fed.R.Evid. 404(b), evidence of a text message that he sent to

co-defendant Najee Murray. For instant, on day four of Petitioner's trial the government

introduced evidence of a text message that Petitioner sent to co-defendant Najee Murray

on July 13, 2012 allegedly asking about obtaining and/or trying to obtain a .38 firearm.

See (Trial Transcripts day #4, 4.329, Lines 1-25 and page 4.320, Lines 1-5) Here, not

only was this text message four days before Petitioner was suppose to have knowledge of

the conspiracy, See (Trail Transcripts page 4.329, Lines 22-25), but more important,

Najee Murray even testifies that the reason why Petitioner wanted the .38 firearm, was

not for the Conspiracy, but to the contrary, it was for his own personal protection.

Therefore, Petitioner contends that the text message should not have been introduced.

19

**(b)**          **Dice Game Robberies**

Furthermore, Petitioner contends that the district court erred and/or should not have admitted, under Fed.R.Evid. 404(b), evidence of prior bad acts - past robberies of dice games. Here, on day six of Petitioner's trial, co-defendant Lafayette Rawls testified during direct that Petitioner had robbed dice games in the past. Petitioner contends that this was a clear error/violation of 404(b) prior bad acts agreement. Not only did Rawls state that the Petitioner robbed dice games in the past once, but he continued to repeat it over objections from trial counsel. See (Trial Transcripts day #6. page 6.81, Lines 7-25 and page 6.82, Lines 1-25)

Petitioner contends not only was the statement never proven to be true by facts, it was also highly prejudiced to Petitioner after the court had already agreed to no 404(b) evidence coming into trial, as long as, Petitioner did not take the stand on his behalf or argue "intent" throughout the trial. This Circuit has already clarified that "evidence of prior bad acts that invites the jury to infer that the defendant had a propensity to violate the law is not admissible even if it might help the jury understand the defendant's intent or motive, United States v. Smith, (3rd Cir. No. 12-1516, 8/6/13) Here, by not presenting the meritorious 404(b) issue on appeal to the Third Circuit, Petitioner was denied effective assistance of counsel, resulting in a trial, but more important, an appeal that cannot be relied on as having produced a just result, particularly within the context of the reviewing errors described in this motion.

Normally, if a trial issue is not raised on direct appeal, it is waived. However, such issue may still be reviewed on the on the merits provided a defendant can show cause for the failure to raise the claim on appeal, as well as prejudiced. Mills v. Singletary, 63 F3d 999, 1026 (11th Cir. 1995).

In the present case, Petitioner can show both cause and prejudice. Petitioner asserts that counsel filed the appeal without any input from the Petitioner, and against his wishes. Therefore, he was not able to review the brief to ensure that counsel raised the meritorious 404(b) issue. Secondly, the prejudiced by counsel's failure to raise this meritorious 404(b) issue is evidenced by Petitioner's conviction and severe sentence. Counsel's failure to raise and/or submit the meritorious 404(b) issue in this situation clearly satisfies the test under <u>Strickland</u> and requires a new trial. For these reasons, the Petitioner was prejudiced by counsel's inadequate representation on appeal and his conviction should be vacated.

III.    **PETITIONER'S APPELLATE COUNSEL DEPRIVED HIM OF EFFECTIVE ASSISTANCE AND DUE PROCESS OF LAW ON DIRECT APPEAL BY FAILING TO ARGUE THAT THE DISTRICT COURT FAILED TO RULE ON HIS RULE 29 MOTION.**

Petitioner contends that appellate counsel was also ineffective on appeal in failing to argue that the district court failed to rule on his motion for judgment of acquittal, pursuant to Rule 29 of Federal Rules of Criminal Procedure. Had appellate counsel challenge on appeal the meritorious issue, a reasonable probability exists that Petitioner's conviction would have been vacated upon remand.

A Fed.R.Crim.P. 29 motion for judgment of acquittal oblieges a district court to review the record in light more favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. United States v. Bobb, 471 F3d 491, 494 (3d Cir. 2006)(internal quotations omitted)  Rule 29(b) directs that where a district court reserves a motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed.R.Crim.P. 29(b).

In the instant case, Petitioner contends that appellate counsel knew that the district court failed to rule on Petitioner's motion for judgment of acquittal, pursuant to Rule 29 of Federal Rules of Criminal Procedure, but failed to raise the issue on appeal. On day six of Petitioner's trial, trial counsel asked the district judge for a mistrial after the Government violated 404(b) agreement and introduced highly prejudicial testimony from allege co-defendant Rawls about Petitioner robbing dice games in the past. See (Trial Transcripts Day #6 pages 6.239, Lines 1-25 and page 6.240, Lines 1-18); see also (Trial Transcripts page 6.451, Lines 11-15)

Here, Petitioner contends that whenever the district court reserved his Rule 29 motion, it had to decide on the basis (i.e. government's violation of 404(b) agreement and highly prejudicial testimony) at the time the ruling was reserved." Unfortunately, for reasons unknown, the district court did not do so. Petitioner contends that appellate counsel was ineffective on appeal for failing to pursue this valid issue. Accordingly, but for counsel's error of failing to challenge on appeal the meritorious issue of the district court's failure to rule on the Petitioner's motion for judgment of acquittal, pursuant to Rule 29 of Fed.R.Crim.P., a reasonable probability exists that the Petitioner's conviction would have been vacated. Therefore, justice requires that Petitioner's conviction and sentence be vacated.

IV.     **WHETHER THE PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING ON THESE ISSUES.**

The Petitioner contends that because of the nature of his claims in the present motion, he should be granted an evidentiary hearing to further prove his claims.

An evidentiary hearing is required in every § 2255 motion so long as the motion alleges facts "which, if true, would warrant habeas relief." United States v. Day, 969 F2d 39, 41-42 (3d Cir. 1992); Tejada v. Dugger, 941 F2d 1551, 1559 (11th Cir. 1991), cert. denied, 502 US 1105 (1992). On a claim of ineffective assistance of counsel, an evidentiary hearing should be held if, on the record, more than one inference can be raised as for the reasons of counsel's actions. Finally, and most important, for purposes of deciding whether or not to hold an evidentiary hearing, the court must take the facts as presented in the motion as true.

In the present case, the Petitioner has alleged in his § 2255 motion facts which taken as true, would allow him relief. Specifically, Petitioner has alleged outrageous government conduct. On appeal, the Petitioner has alleged that counsel was ineffective for failing to argue that the lower court should not have admitted, under Fed.R.Evid. Rule 404(b), evidence of his text messages, nor any prior bad acts; and that counsel failed to argue that the district court failed to rule on his motion for judgment of acquittal, pursuant to Rule 29 of Federal Rules of Criminal Procedure. Further, the Petitioner contends that additional facts which would support his claims are not contained within the record. In the present case, if the Court takes the Petitioner's allegations as true, the Petitioner is entitled to relief. Therefore, to ensure that the fundamental tenants of due process are comported within this case, an evidentiary hearing should be held to determine the facts surrounding each of the issues raised by the Petitioner.

23

## CONCLUSION

WHEREFORE, Petitioner asserts that not only did he provide the necessary evidence of outrageous government conduct, but he has also, provided the proof necessary for an evidentiary hearing on these matters. The Petitioner need only show an indicia of reliability for the court to grant an evidentiary hearing. The Petitioner asks this Court to make an order vacating his conviction and sentence in the instant case, based upon outrageous government conduct and upon the ineffective assistance of counsel received at trial and on appeal.

Respectfully submitted,

_____ 5 / 22 /2017
Frank Thompson
Reg.No.#68400-066
FCI McKean
P.O. Box 8000
Bradford, PA 16701

## CERTIFICATE OF SERVICE

I, FRANK THOMPSON, hereby certify that a true and accurate copy of the foregoing motion was served on this 22 day of May, 2017, by ordinary US Prepaid Mail upon the Office of the United States Attorneys, 615 Chestnut Street, Suite 1250, Philadelphia, PA 19106. The mailing were placed in "legal mail" at FCI McKean (PA) per 28 CFR 540.

_____ 5 / 22 /2017
Frank Thompson