**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


**UNITED STATES OF AMERICA** :

    **v.** : **CR. NO. 12-418-05**

**FRANK THOMPSON** :


**GOVERNMENT'S RESPONSE IN OPPOSITION TO
MOTION UNDER 28 U.S.C. § 2255**


Frank Thompson presents a motion under 28 U.S.C. § 2255 based on meritless claims. The motion should be denied without a hearing, and no certificate of appealability should issue.

## I.      Background.

### A.      Factual Background.

This case involves a "stash house sting," in which the defendants agreed to commit a robbery of a drug stash house, unaware that the scenario was devised by federal agents in an effort to safely apprehend those committed to this sort of criminal activity.

In May and June 2012, a confidential informant ("CI") contacted Robert Whitfield and asked for help getting in touch with Kwasi Payne, whom the CI

knew robbed drug dealers. Supp. App. 51-52.[1] After additional requests to Whitfield to make this contact, Whitfield told the CI: "That's what I do." Supp. App. 81, 85-86. The CI and Whitfield arranged to meet on June 19, 2012. Supp. App. 82.

On June 19, the CI met with Whitfield and explained that the CI had a friend who knew of a robbery target that involved drugs. When the CI told Whitfield he wanted to contact Payne for the proposed robbery, Whitfield volunteered to do the robbery instead. Supp. App. 85-91. The CI agreed to arrange a meeting between his friend and Whitfield the following week. Supp. App. 97.

On June 27, 2012, the CI and ATF Agent Patrick Edwards, posing as the CI's friend, met with Whitfield. Supp. App. 97. Edwards said that he knew of a stash house containing at least ten kilograms of cocaine that they could steal. Supp. App. 99, 102-03. Whitfield told Edwards that he has been committing similar robberies for many years, with the help of accomplices. Supp. App. 98-99. Whitfield described how he would commit the proposed robbery, including the use of guns, and how he would break down the cocaine with Edwards. Supp. App.

---

[1] The citations are to the supplemental appendix filed by the government in Thompson's appeal in the Third Circuit, No. 14-4512. The appendix consisted of parts of the trial record. We will provide a copy to this Court at its request. The statement of facts here is consistent with the summary presented by the Court of Appeals in addressing Thompson's appeal. *United States v. Thompson,* 639 F. App'x 154, 155-56 (3d Cir. 2016).

104, 106-10, 114-16. Whitfield told Edwards that a kilo of cocaine had a street value of approximately $40,000. Supp. App. 114-15. Whitfield described several successful home invasions that he had previously committed, and agreed to bring accomplices to meet with Edwards the following week. Supp. App. 108-10, 116, 122-23.

On July 3, 2012, Edwards and the CI met with Whitfield and his brother. Supp. App. 125. Edwards reviewed with both brothers the information he had previously told Whitfield about the stash house and cocaine. Supp. App. 125-30.[2] Whitfield said he would supply firearms and bulletproof vests, and again discussed how Edwards would be paid after the sale of the stolen cocaine. Supp. App. 127-28, 243-44.

On July 16, 2012, Whitfield called Edwards to confirm a final pre-robbery meeting, and said that he and his accomplices would be ready for the robbery. Supp. App. 131. On July 17, 2012, Whitfield met with Edwards and the CI. Supp. App. 131-32. Whitfield again talked about his previous robberies. Supp. App. 734-35. After approximately ten minutes, Najee Murray arrived, whom Whitfield introduced as a robbery accomplice. Supp. App. 134. Edwards described the stash house where ten kilograms of cocaine was allegedly located, and Whitfield made suggestions about the robbery plan. Supp. App. 132-34, 733, 736. The men agreed to meet the next morning to conduct the robbery. Supp. App. 134.

---

[2]  Whitfield's brother did not show up on the day of the planned robbery and was not charged in this case.

On July 18, 2012, Whitfield and seven accomplices – Murray, Graham, Kenneth Parnell, Frank Thompson, Lafayette Rawls, Jamie Dales, and Kareem Long – appeared at the initial meeting spot at a Hilton Hotel. Supp. App. 140-46. Graham and Whitfield were the first to arrive at the scene. Supp. App. 140. Edwards explained the robbery scenario to Graham. Supp. App. 140-41. Murray and Thompson joined the group shortly thereafter, and Edwards again explained the robbery scenario. Supp. App. 142. Edwards explained the scenario a third time after Rawls, Long, Dales, and Parnell arrived, this time while the group was in the hotel parking lot. Supp. App. 144-47.

Edwards described the layout of the stash house, stating that it would be occupied by two men – a young man with a gun and an older man with a cooler of cocaine. Supp. App. 102-03, 146-47. Edwards said he had seen an "AK" inside the house on one occasion. Supp. App. 147. None of the men indicated any surprise about the robbery, or expressed a desire not to participate in it. Supp. App. 147, 150.

During the ensuing discussion, Parnell said that they would shoot the guards if they challenged the robbers. Supp. App. 181. Whitfield told the group that he had two guns in the car, Supp. App. 181, and that he did not care who got hurt during the robbery, Supp. App. 168. Graham said that he had a gun in Rawls' car. Supp. App. 162. The group was told that that the stolen cocaine would be broken down and shared after the robbery, although no specific details were worked out at the meeting. Supp. App. 169.

While in the hotel parking lot, Edwards specifically asked if anyone wanted out of the robbery, stating that if so, now was the time to leave. Supp. App. 152. None of the defendants declined to participate or exhibited any reluctance to take part in the robbery. Supp. App. 150-52. At that point, the group left the Hilton Hotel and drove in a caravan of five cars to a junkyard where Edwards had a rental van, purportedly for use during the robbery. Supp. App. 170-72. Graham, who rode in Edwards' car, said that this was not his first robbery, and then said: "Everybody making money, everybody cool." Supp. App. 44d, 183. Most of the group proceeded to the junkyard, while Murray and Thompson parked at the gas station next to the junkyard to await further instruction. Supp. App. 184-86, 806-09.

Once at the junkyard, some of the crew, including Long, inspected the rental van that would be used in the robbery. Supp. App. 187-88. Long asked Edwards if he could leave his car at the junkyard during the robbery and ride to the robbery in Rawls' car. Supp. App. 193. Whitfield handed out gloves, and Graham retrieved a bag from his car which was later found to contain a gun. Supp. App. 188-89. While Edwards was ostensibly waiting for a call with the location of the stash house where the group would commit the robbery, Graham and Long went to the trunk of a vehicle, Long bent down into the trunk, and Edwards heard the sound of a gun racking. Supp. App. 190.

Meanwhile, as Thompson and Murray were waiting for further instruction at the gas station, Thompson noticed law enforcement officers closing in. Supp.

App. 810. He and Murray attempted to drive away but were stopped by officers. Supp. App. 810-11. Murray had a loaded 9mm handgun in his waistband. Supp. App. 813. The other defendants were also arrested at the scene. Supp. App. 196. Officers recovered three loaded firearms from the other defendants. Supp. App. 511-22.

## B. Procedural History.

On August 8, 2012, a grand jury in the Eastern District of Pennsylvania returned an indictment charging the eight men with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 18 U.S.C. § 2 (Count Two); one count of conspiracy to possess five kilograms or more of cocaine with the intent to distribute, in violation of 21 U.S.C. § 846 (Count Three); one count of attempted possession of five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count Four); and one count of carrying a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Five). Long and Thompson were also charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Six).

Rawls and Murray pled guilty and testified for the government at trial. Dales also pled guilty. The other five defendants proceeded to trial, and on May 22, 2013, all were convicted of the five counts in which they were mutually

charged. The jury acquitted Long and Thompson of the Section 922(g) offense charged in Count Six.

After trial, the trial defendants filed numerous motions, which were denied. In part, the appellants sought a hearing and discovery on the issue of racial profiling and selective prosecution, alleging that they had been targeted for prosecution by the government based on their race, and discovery was necessary to enable them to pursue a motion to dismiss the indictment on the basis of selective prosecution or enforcement. The district court denied the motions, finding that the defendants waived this issue by failing to raise it before trial, and even if timely, the appellants had failed to make the requisite threshold showing for such discovery. Docket no. 378.

The defendants also filed motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, arguing that the evidence was insufficient to satisfy the interstate commerce element of the Hobbs Act. Graham, Parnell, and Long also alleged the evidence was insufficient to support their convictions on the conspiracy counts. The Court denied these motions. Docket nos. 390, 410, 420, 445, 455.

Graham filed a post-trial motion to dismiss the indictment on the ground that the government's use of a "sting" scenario in this case amounted to outrageous government conduct. Whitfield also moved the court to dismiss the indictment on this same ground. The district court denied these motions. Docket no. 411.

On November 14, 2014, Thompson was sentenced to 252 months' imprisonment and a ten-year period of supervised release, and ordered to pay a fine of $1,000 and a special assessment of $500.

Thompson filed an appeal, docketed at No. 14-4512. He argued that the government presented insufficient evidence on the two conspiracy counts. On May 5, 2016, the Third Circuit rejected this claim, stating:

> We conclude that the evidence of Thompson's guilt on the conspiracy charges was sufficient to support the jury's verdict. Although the evidence against Thompson was perhaps not as strong as against some of his co-defendants, he nonetheless attended the "informational" meeting with the undercover agent at the Hilton and then proceeded to the junkyard with the others. He also expressed no hesitation about participating in the scheme, even after the agent gave everyone the opportunity to back out. Finally, he openly discussed the robbery with one of his co-conspirators. Thus, his assertion that his "involvement" was marked by "inaction and silence" rings hollow.

639 F. App'x at 156. Thompson also argued on appeal that the district court should have granted the defendants' motion for judgment of acquittal because the fictitious stash-house robbery could not possibly have affected commerce under the Hobbs Act, and that the district court should have granted the motion for discovery to pursue a claim of selective enforcement. The Court of Appeals stated that it rejected these arguments for the same reasons it denied the claims in the appeal of co-defendant Whitfield, *see United States v. Whitfield*, 649 F. App'x 192, 196 (3d Cir. 2016). *Thompson,* 639 F. App'x at 156 n.5.

Thompson is presently serving his sentence, with a projected release date of November 26, 2030.

On June 19, 2017 (docket no. 629), Thompson presented a pro se motion under Section 2255. The Court appointed counsel, who filed a supplement on March 29, 2019 (docket no. 729). The Court granted requests by the government for extensions of time to respond, initially ordering the filing of a response by December 20, 2017. The government did not file a response, and apologizes for that error. On August 12, 2019 (docket no. 735), the Court ordered the government to file a response by October 11, 2019. The undersigned, upon learning of the government's earlier negligence, immediately undertook the preparation of this response.

## II.    Argument.

Thompson presents two claims for relief, which are without merit.

### A.    Claim no. 1: The indictment should be dismissed on the basis of "outrageous government conduct."

Thompson asserts in his pro se motion that the indictment should be dismissed on the basis of "outrageous government conduct," arguing that the government's employment of a fictitious stash house robbery plot offended due process. However, this Court has already denied the same claim in this case. The issue was presented after trial by defendants Whitfield and Graham. This Court addressed the merits at great length and determined that the outrageous government conduct doctrine does not apply. Docket nos. 386, 411, 423. That ruling remains the law of this case and necessitates denial of Thompson's claim.

In fact, it is clear from later developments in the Third Circuit that the Court of Appeals agrees. It remains the case that the Third Circuit has only applied the doctrine once, in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), while later questioning whether the doctrine in fact exists, *see, e.g., United States v. Nolan-Cooper*, 155 F.3d 221, 229-31 (3d Cir. 1998). *See United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017) (repeating that "[t]his Court has granted relief on a claim of outrageous government misconduct only once").

Following this Court's ruling, the Third Circuit rejected application of the outrageous conduct doctrine in a virtually identical case, *United States v. Dennis*, 826 F.3d 683, 694-95 (3d Cir. 2016), involving a stash house sting. Like Thompson and his co-defendants, "Dennis contends that the Government created the crimes; that it had no credible basis for asserting that he was supporting himself and his family with criminal activity, nor any basis for suspecting Dennis would participate in the crimes; that the Government actively encouraged Dennis to participate in the crimes; and finally, that it provided the necessary information and implements for the crime." *Id.* at 695. The Court found such facts insufficient under its precedent to support dismissal of the indictment, just as this Court held in denying the defendants' post-trial motion to dismiss. Likewise, in *United States v. Washington*, 869 F.3d 193, 209-10 (3d Cir. 2017), another identical stash house sting case, the Third Circuit rejected application of the outrageous conduct doctrine to challenge application of a mandatory

minimum sentence based on the ten-kilogram quantity conjured by the agent who created the scenario. *Id.* at 212-13.

Thus, in light of this Court's post-trial rejection of the argument, which has been validated by subsequent Third Circuit rulings, Thompson's new claim should be denied.

**B.    Claim no. 2: Counsel were ineffective in failing to seek a jury instruction or press for a mistrial based on the admission of Rule 404(b) evidence.**

In his pro se motion, Thompson asserts that his appellate counsel was ineffective for failing to object to the introduction of two sets of 404(b) evidence. In a supplemental filing, Thompson's counsel presses one of these claims (extending it to trial counsel as well).

Counsel does not make an argument in support of Thompson's first 404(b) argument, for good reason. Thompson objects that, during the testimony of cooperating witness Najee Murray, the government introduced text messages sent between the two men. The messages revealed that days before Murray contacted Thompson to recruit him for the robbery, they had exchanged text messages in which Thompson asked Murray for help in obtaining a gun for personal protection, but no acquisition took place. Later, when Murray picked up Thompson for the robbery, he told Thompson that he brought his own gun, so it was not a problem that Thompson did not have one. The prosecutor explained that the text message explained this later conversation. Upon hearing this explanation, the Court stated, "This is about the gun, it's not about any prior bad

act, it's about having a gun on that day." Defense counsel then stated no objection, saying, "Very good, Judge." 5-16-13 Tr. 4.329. This evidence was likely beneficial to Thompson in showing that he did not bring a gun to the planned robbery. The parties thus agreed that Rule 404(b) was not implicated.[3]

Thompson's second claim of 404(b) error, which his newly appointed counsel buttresses, is also without merit. It involves a videotape recording introduced at trial in which various conspirators gathered at the meeting location and discussed the robbery. Thompson asserts that in this recording he is heard admitting participation in previous robberies of dice games, and that the Court should have either excluded this evidence or at minimum given a corrective instruction. But Thompson in fact made no admission at all, and the government never asserted otherwise.

This is the full pertinent segment that the jury saw and heard (the relevant pages of government trial exhibit 84A, consisting of the transcript, are attached):

385. Agent:   That's why I wanted to make sure everybody got the plan together because once it's a go that's it. So if anybody want out, this is, this is the second, I'm saying, because once it's start. Y'all got the hard part. My shit is easy. I just gotta get down.

386. Unidentified: [Unintelligible.]

387. Agent:   [Laughs] Like I said, I got the easy part. That's why I said [unintelligible].

---

[3] Moreover, the jury later acquitted Thompson on a charge of possession of a firearm by a convicted felony. He plainly was not prejudiced by the text message.

388. Rawls:    Niggas did this shit for less than this. There should be no problem going in to get them chumpies.

389. Agent:    Right, right.

390. Rawls:    Real rap. Niggas done put they life on the line for way less than this. So it should be no problem.

391. Thompson:    [Unintelligible] Damn dice game.

392. Unidentified: Damn straight. All types of shit.

393. Agent:    Right, right.

394. Rawls:    If there's money here, you gotta go.

395. Thompson:    [Unintelligible] fucking. The niggas out there spoiling you. You got, got seventeen niggas spoiling on one ground.

396. Agent:    [Laughs] So if y'all ready to roll, man, let's roll. Just follow me. Like I said I'm, I'm, so are you gonna use a van or what?

It appears that Thompson's first statement, "damn dice game," was just his participation in the conversation, and agreement that people have put their lives on the line for less than a stash house robbery. It does not assert that anyone, let alone Thompson, committed a robbery. His second statement, "The niggas out there spoiling you. You got, got seventeen niggas spoiling on one ground," is simply unintelligible. It certainly does not convey participation by anyone in a robbery of a dice game, as the defense now insists.

At trial, asked for his understanding of this statement, Agent Edwards testified: "Well, that was preceded by Lafayette Rawls mentioning, generally, we've done stuff for less, you know, we terms of the risk and in terms of what –

what the we — in what they would receive. And in response to that, Thompson starts mentioning about dice games and stuff in the context of, you know, we've done stuff for less." 5-16-13 Tr. 4.156-57. Agent Edwards properly did not attribute to Thompson any participation in earlier robberies.

Thompson's counsel nevertheless immediately objected at sidebar, on 404(b) grounds. Before the prosecutor could explain, the Court simply directed her to move on. *Id.* at 4.157.

Later, Lafayette Rawls also addressed the conversation. Rawls said that he had expressed the view that everyone present had done things for less, when Thompson made his statement. Asked his understanding, he replied, "When — from when I had said, that people had did stuff for less than this, he had said, that he didn't — basically, he had did stuff — he just was showing that he did stuff for less than this, like, robbing dice games." 5-20-13 Tr. 6.81. Defense counsel again objected. The Court stated, "Could you just ask him, what did it mean to you, that's fine . . . the objection is overruled." The prosecutor obliged, and Rawls responded, "That he done did stuff for less than this, he'd done robbed dice games for . . . that was less than this." *Id.* at 6.82.

Thompson now asserts that the government improperly introduced Rule 404(b) evidence of other acts, and that further the Court erred in not providing a limiting instruction. But the government had no intention of presenting 404(b) evidence associating Thompson with previous robberies of dice games. In Thompson's statement, he did not say that he robbed anyone. Rather, after Rawls

talked about doing things for less, Thompson only said, "Damn dice game and fucking the niggers out there spoiling you, you got – you got seventeen niggers spoiling you on one ground." This on its face was not an admission of robberies; in fact, it is not clear what the statement means at all. When asked to explain it, Rawls said that "spoiling" referred to a "petty dice game." 5-20-13 Tr. 6.82. At most, when Rawls talked about people doing robberies for less, Thompson then referred to "petty dice games," but without making a personal admission. Agent Edwards did not suggest otherwise. 5-16-13 Tr. 4.156-57. Only Rawls volunteered that Thompson was making a personal admission of robbing dice games.

The prosecutor was thus understandably taken aback. When, after Rawls testified, defense counsel sought a mistrial, the prosecutor stated that she did not understand Thompson to have said that he himself committed robberies. "He said, that it was in reference to what they would all do for less, not that Frank Thompson had done dice-game robberies, but Frank Thompson was referring to dice-game things and the words, robberies isn't in the video and it's not in the transcript, your Honor." 5-20-13 Tr. 6.240. Defense counsel agreed that it was "gratuitous volunteering" of information by the witness. *Id.* The Court took the motion for mistrial under advisement.

In fact, not only was Rawls' expressed understanding not supported by the actual statement, which the jurors heard, but Rawls himself had no basis of knowledge of Thompson's past other than what Thompson said on tape. Rawls testified before the jury that he recruited Long, Parnell, and Dales to participate

in the robbery, specifying that he had participated with Dales in robberies before. 5-17-13 Tr. 5.299-301. But as for Thompson, Rawls said he had never met him; he did not know him, and saw him for the first time when the men gathered to commit the robbery. *Id.* at 5.292, 5.312. The transcript reveals that these were among the first words that Rawls ever heard Thompson utter. The jury certainly knew that Rawls was in no better position to interpret Thompson's statement than it was.

Consistent with their understanding of the statement, which was different from Rawls', the prosecutors never suggested to the jury that Thompson had admitted dice game robberies, or that any inference could be drawn from that. In the principal closing argument, the prosecutor did not refer to the "dice game" statement at all. *See* 5-21-13 Tr. 7.244-247 (government closing argument regarding Thompson). A prosecutor mentioned the dice game quote in rebuttal, when reviewing the transcript of the full conversation, but said nothing about it or any connection to robberies. 5-23-13 Tr. 8.23. For his part, Thompson's trial counsel also saw no reason to mention the statement or address it. *See* 5-21-13 Tr. 7.330-346 (closing argument for Thompson).

The Court stated that it would take the mistrial motion under advisement, but it never ruled on it. Thompson presently asserts that his trial counsel was ineffective, in not pressing for a ruling, and in not requesting a corrective instruction. He adds that appellate counsel was ineffective as well in not raising the issue on appeal. But in fact, this was a minor issue, such that counsel were not

ineffective in not pressing the issue, and Thompson certainly suffered no prejudice.

As is clear from the record, Thompson did not make any admission of participation in any previous robbery. When Rawls said that people committed crimes for less, Thompson simply referred to dice games. Only Rawls made the leap and association that Thompson himself was admitting participation in prior robberies. But that is not a reasonable interpretation of the cryptic statement, and the government never pressed this to the jury, or even mentioned it again. In this light, the question is whether a jury would be prejudiced simply because one witness, who had never met Thompson before, thought Thompson admitted prior robberies of "petty dice games," when the jurors could hear with their own ears that that was not the case. The question is whether that stray and unsupported statement by Rawls, in the middle of an eight-day trial, caused any harm.

An error in the introduction of evidence is harmless if it is "highly probable that the error did not contribute to the judgment." *United States v. Brown*, 765 F.3d 278, 295 (3d Cir. 2014). *See, e.g.*, *United States v. Lee*, 612 F.3d 170, 189 (3d Cir. 2010) (improper admission of statement under Rule 404(b) was harmless under this standard in the context of the overall evidence); *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 2006) (holding that the district court's error in admitting certain witness testimony was harmless because other evidence was "overwhelming" and the government did not reference that testimony in its closing argument).

There clearly was no harm to Thompson. There was considerable evidence of his guilt – he was recruited and appeared to commit the robbery; did not depart after the robbery was fully explained and he was given the chance to back out; discussed the plan on tape with his confederates; took up a position with Murray at the final gathering location; and endeavored to flee with Murray when he saw law enforcement approaching. In light of this evidence, the notion that the jury convicted only because Rawls thought that Thompson admitted participation in robberies of petty dice games is untenable, particularly where the government never mentioned that evidence in support of its case and the statement at issue was heard by the jury word for word and did not support Rawls' interpretation. Rawls' one stray and dubious statement, based on evidence the jury could consider for itself that did not support Rawls' view, certainly caused no harm. It is beyond highly probable that the statement did not contribute to the judgment. In fact, counsel arguably would have disserved his client by calling further attention to the statement by requesting an instruction addressing it. Instead, not surprisingly, counsel's cross-examination of Rawls on behalf of Thompson lasted mere minutes, after counsel reestablished that the men did not know each other. 5-20-13 Tr. 6.151.[4]

---

[4] If in fact Rawls were right, and Thompson was admitting participation in robberies of "petty dice games," the statement would indeed be admissible under Rule 404(b). The statement as interpreted by Rawls, that Thompson robbed dice games for less and therefore had no qualms about participating in a far more lucrative robbery, would certainly be admissible as a declaration of Thompson's intent and motive to participate in the stash house robbery. *See, e.g.*, *United*

With respect to prejudice, all counsel states is this:

> The second prong of the *Strickland* test also is met. There is a "reasonable probability that, but for counsel's error, the result would have been different". *Copenhefer*, 696 F.3d at 389. Evidence that Movant in the past robbed illegal dice games, when he was charged with conspiracy and attempt to rob an illegal drug operation, were too close for comfort and indisputably would lead the jury to conclude that Movant had the propensity to commit robberies. That likely impact of the jury's verdict was exacerbated because the District Court gave a limiting instruction as to the purposes for which the jury could consider other crimes evidence regarding codefendants Whitfield and Long. N.T. 5/22/13 at 8.51 - 8.52.

Supplemental Motion at 23-24. This is unpersuasive. There was no evidence presented that Thompson in the past robbed illegal dice games, only an interpretation by one witness who did not know Thompson of a statement that does not bear that interpretation. And the standard is not "too close for comfort." It is whether it is highly probable that the one snippet of testimony did not

---

States v. Green, 617 F.3d 233 (3d Cir. 2010) (upholding the admission of evidence that the defendant tried to acquire dynamite to kill an undercover officer involved in the underlying drug investigation, as the evidence helped explain the conversations between the defendant and a cooperator, and explained the cooperator's motives in assisting law enforcement). In that situation, the error would be that the Court did not give a requested instruction regarding the limited use of the statement. *United States v. Davis*, 726 F.3d 434, 445 (3d Cir. 2013). That error too would be harmless. The Court gave such an instruction with respect to 404(b) evidence introduced against Whitfield and Long, employing the Third Circuit's model instruction on the subject to make clear that the jury could not infer propensity from prior wrongdoing. Even without that instruction, it is unlikely in the extreme that any reasonable juror would determine that because Thompson participated in a robbery of a "petty dice game," that he therefore committed to an armed assault on a guarded stash house containing ten kilograms of cocaine. In any event, this is an academic exercise, as the actual statement made by Thompson did not admit any prior robbery and the government never argued otherwise.

contribute to the verdict. That test is easily met here, and Thompson has not established prejudice.

In the end, Thompson did not admit to robbing dice games, and no 404(b) evidence was improperly admitted in this regard. Further, Thompson did not suffer harm from Rawls' single reference to robberies of dice games, based on a statement that did not admit any robberies. Thompson's claims in his 2255 motions should be denied.

## III. Conclusion.

As explained above, Thompson's claims are without merit. They should therefore be denied without a hearing, and no certificate of appealability should be issued. *See United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005) (no hearing is required where the "motion and the files and records of the case conclusively show" that the movant is not entitled to relief) (citation omitted); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (a certificate of appealability shall not issue where reasonable jurists would not debate the lack of merit of the issues presented).

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

_/s Robert A. Zauzmer_
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

**Attachment:**

**Excerpt from Government Trial Exhibit 84A**

376. JD: See you outside.

377. KP: Plus the motherfucker might [UI].

378. UA: I'll take my time and call. I'll just take my time and park. I'll just take my time and park slow.

379. JD: Then we can see if anybody around.

380. KP: [UI]

381. FT: That's how it gotta be.

382. UA: Right.

383. UM: [UI]

384. KP: Y'all coming out like [UI]

385. UA: That's why I wanted to make sure everybody got the plan together because once it's a go that's it. So if anybody want out, this is, this is the second, I'm saying, because once it's start. Y'all got the hard part. My shit is easy. I just gotta get down.

386. UM: [UI]

387. UA: [Laughs] Like I said, I got the easy part. That's why I said [UI].

388. LR: Niggas did this shit for less than this. There should be no problem going in to get them chumpies.

389. UA: Right, right.

390. LR: Real rap. Niggas done put they life on the line for way less than this. So it should be no problem.

391. FT: [UI] Damn dice game.

392. UM: Damn straight. All types of shit.

393. UA: Right, right.

394. LR: If there's money here, you gotta go.

395. FT: [UI] fucking. The niggas out there spoiling you. You got, got seventeen niggas spoiling on one ground.

Undercover Meet between UA and LW
Case Number: 766075-12-0016
Date: 7/18/12
Transcribed by Para-Plus Translations, Inc.                    Page 21 of 28

396. UA: [Laughs] So if y'all ready to roll, man, let's roll. Just follow me. Like I said I'm, I'm, so are you gonna use a van or what?

397. UM: [UI]

398. UA: All right. So I'll just you take y'all in the van. Y'all gonna leave a car or here or something? How you gonna do it?

399. LW: [UI] [P]

400. UA: You riding with me? [P, walking] This ain't your first time either, huh?

401. MG: Nah. First time so much, but it ain't my first time.

402. UA: Right.

403. UA: I was telling my man, I was, I mean I just want a good crew. I, young boys scare me because you know the first thing they wanna do is go in and pop off. That's good if you need to but there ain't always a need for that shit.

404. MG: Naw. That's not how I was taught. What I was told, what I learned on my own. [UI] You draw too much attention [UI] you can't do it again. [UI] that I was told.

405. UA: Right.

406. MG: [UI]

407. UA: Right.

408. MG: [UI]

409. UA: Right.

410. MG: [UI]

411. UA: Right, right. That's what I'm saying Wanna keep this shit. I want to keep this shit going.

412. MG: I mean I do…

413. UA: As many times as we can.

414. MG: : Hm-hm. Everybody making money, everybody cool.

Undercover Meet between UA and LW
Case Number: 766075-12-0016
Date: 7/18/12
Transcribed by Para-Plus Translations, Inc.                    Page 22 of 28

## CERTIFICATE OF SERVICE

I certify that I caused a copy of this pleading to be served by ECF electronic filing upon:

Rocco C. Cipparone, Jr., Esq.
203-205 Black Horse Pike
Haddon Heights, NJ  08035


/s Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney

Date: September 12, 2019.